Filed 10/24/13  In re J.B. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.B. et al., Persons Coming Under the Juvenile Court Law. | B245207 (Los Angeles County Super. Ct. No. CK78475) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.B., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court for Los Angeles County.  Steven R. Klaif, Juvenile Court Referee.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] M.B. (Mother) challenges the sufficiency of the evidence supporting the juvenile court's jurisdictional finding and dispositional order. We affirm.

## BACKGROUND

On July 26, 2012, the Los Angeles County Department of Children and Family Services (DCFS) received a custody alert that Mother (age 21) had been arrested for burglary at a Target store, and her two sons (J.B., age 3 and C.B., age 22 months) were being held at the police station in Pasadena. As set forth in DCFS's detention report, Mother "took items from a clearance rack inside the store and then attempted to return them in exchange for the cost of the merchandise being put onto a store gift card." Mother told a DCFS social worker, who interviewed Mother at the station, that she "became scared and left the store with about five shirts." Mother's children were with her at the store when she was arrested. Mother told the social worker she "didn't think that stealing was a serious crime and that her children were not in any danger." Mother's girlfriend, T.K., also was at the store with Mother and the children and was arrested for grand theft auto because she was driving a car that had been reported stolen. Mother told an officer she did not know T.K. was driving a stolen car.

The social worker observed that the children were dressed and groomed appropriately, appeared on target developmentally and were free of bruises or other marks of physical abuse. The three-year-old child told the social worker Mother disciplined him by taking away his toys and making him sit down, and not by hitting him. As set forth in the detention report, the juvenile court was involved with this family in prior dependency proceedings from August 2009 to August 2011 after Mother was arrested for child endangerment. Apparently Mother left then eight-month-old J.B. "in a stroller, in the driveway of her home, unattended and without adult supervision for at least thirty minutes."

---

[1] Further statutory references are to the Welfare and Institutions Code.

During her interview at the police station on July 26, 2012, Mother told the social worker she was unsure about the identity of the fathers of her two children.[2] She stated her ex-girlfriend, C.F., was close to the children and visited them almost every weekend even though she and Mother were no longer a couple. Mother called C.F. after her arrest. C.F. came to the police station and volunteered to care for the children. DCFS declined to place the children with C.F. due to her criminal history and living situation (she rented a room in a home where other adults resided). DCFS also declined to place the children in the home of Mother's great-aunt, where Mother and the children had been living temporarily, due to DCFS's prior involvement with the great-aunt and four of her children. DCFS placed the children in a foster home.

On July 31, 2012, DCFS filed a dependency petition under section 300, subdivision (b), alleging Mother placed her two children in a detrimental and endangering situation when she shoplifted. At the detention hearing the same day, Mother appeared and asked the juvenile court to release the children to her. The court ordered the children detained in foster care and granted Mother twice weekly monitored visitation.

In an interim review report, dated August 21, 2012, DCFS stated Mr. and Mrs. F. wanted to care for Mother's children. Mr. and Mrs. F. are the parents of Mother's ex-girlfriend, C.F. Although these prospective caregivers did not have a criminal history, had a relationship with the children and had enough space to care for the children, DCFS recommended the children remain placed in foster care. During the prior dependency proceeding involving Mother and her son J.B., DCFS and the juvenile court learned about a history of domestic violence between Mother and C.F. DCFS reported: "During the time mother was involved in a relationship with [C.F.], mother reported at least on two separate occasions she was hit and or choked by [C.F.] Further DCFS received referrals to the Child Abuse Hotline alleging physical abuse to mother by [C.F.] Further [the]

---

[2] The alleged fathers are not parties to this appeal.

[F.]'s minimizing this aspect of their daughter's life is not in the very young children's best interest."

In the jurisdiction/disposition report, dated August 21, 2012, DCFS described Mother's August 7, 2012 interview with a social worker. According to Mother, her children were in the car with Mother's girlfriend T.K., outside the Target store, at the time of Mother's arrest. T.K. brought the children inside the store to go to the bathroom and officers detained the children. Mother told the social worker the grand theft auto charge against T.K. was dropped because T.K. had borrowed the car she was driving. Mother also stated, "she knows she was wrong for having the children with her when she was shoplifting, but didn't think anything would happen and didn't see how much this would affect the children."

Mother also told the social worker she wanted her children back in her care. She was living with T.K. in San Bernardino County and wanted the dependency case transferred there. Neither Mother nor T.K. was employed. T.K. received Supplemental Security Income (SSI). Mother did not receive any income. Mother planned to take a class with Liberty Tax Service and hoped to be employed there in the next tax season (as she had been during the previous tax season). Mrs. F. told the social worker she and her husband had always helped Mother care for the children and had provided financial support. Mother had maintained regular telephone contact with the children since their detention and scheduled her first visit for August 18, 2012.

DCFS recommended the juvenile court declare the children dependents of the court and order reunification services for Mother. Although DCFS acknowledged Mother seemed remorseful for her actions, DCFS did not believe Mother understood "how her way of life, her choices in relationships and her actions have affected the children over the years."

4

At a hearing on August 21, 2012, the juvenile court heard and denied Mother's *Marsden* motion.[3] The parties informed the court they had set the case for mediation on September 24, 2012. DCFS informed the court that Mr. and Mrs. F.'s home had been approved for placement, but DCFS was not recommending the children be placed there because of the history of domestic violence between Mother and C.F. The children's counsel also was not in favor of the children being placed there. Mother requested the children be placed with Mr. and Mrs. F. The juvenile court granted DCFS discretion to place the children in the home of Mr. and Mrs. F., but only if the children's counsel agreed with the placement.

On August 25, 2012, DCFS placed the children in the home of Mr. and Mrs. F. In a last minute information for the court, dated September 24, 2012, DCFS informed the juvenile court that Mother was "comfortable with the placement and the arrangements of the visits," and Mother's monitored visits were going well.

On September 24, 2012, DCFS prepared a document entitled, "Mediated Agreement Subject to Signatures of Counsel and Parties." (Bold font and caps. omitted.) The agreement was signed by Mother, a DCFS dependency investigator and counsel for DCFS. Mother's counsel and the children's counsel did not sign the agreement. The agreement included amended language for count b-1 in the petition, stating: "On 7/26/2012 the children J[.] and C[.]'s mother, [M.B.], placed the children in a detrimental and endangering situation by shoplifting while the children were in her care. Such detrimental and endangering situation established for the children by the children's mother places the children at risk of harm." The agreement also included a disposition plan of suitable placement for the children, family reunification services for Mother and a transfer of the case to San Bernardino County. The visitation plan in the agreement provided for monitored visitation three times per week, three hours per visit, but also

_____

[3] *People v. Marsden* (1970) 2 Cal.3d 118. We have reviewed the reporter's transcript from the hearing on Mother's *Marsden* motion. Mother does not argue the juvenile court erred in denying the *Marsden* motion and we have found no error.

allowed for Mother to have unmonitored contact with the children for up to two hours per visit. The visitation plan also provided for DCFS "discretion to liberalize restrictions on mother's contact with the children."

Also on September 24, 2012, because the matter did not settle at the mediation, the juvenile court held the adjudication/disposition hearing. At the outset of the hearing, DCFS introduced and the court admitted into evidence the various reports discussed above. The children's counsel stated she would not be offering evidence but would present argument as to disposition only. Mother's counsel stated Mother had a witness, but before examining the witness, Mother's counsel "wanted to clarify whether the mediated jurisdictional language this morning -- whether we're contesting the jurisdictional or we are solely contesting dispositional issues." The children's counsel, who did not sign the mediated agreement, stated she had "no objection to the mediated language" for count b-1. The juvenile court stated: "So we're only on for contested disposition. The -- all counsel are submitting on the mediated agreed language. The -- so you have a witness for disposition?" Mother's counsel responded: "That's correct, Your Honor."

DCFS's counsel requested an offer of proof regarding the testimony of Mother's witness. Mother's counsel stated the witness, Mother's girlfriend T.K., would testify about the shoplifting incident on July 26, 2012. The court responded: "Well, wait a minute. If she's a witness to these incidents, what is the relevance to disposition versus jurisdictional? You're not contesting the jurisdiction issues so what is she testifying to that's relevant to disposition?" Mother's counsel explained that she planned to elicit testimony to "show that Mother does not pose a risk to the children." The court allowed T.K. to testify.

T.K. testified that Mother left the children in T.K.'s care when she went into the Target store on July 26, 2012. T.K. stated she did not give Mother any reason to believe the children were not safe in her care. Mother did not know of any problems with the car T.K. was driving. The children were in T.K.'s care when Mother was arrested for shoplifting. Mother had planned to leave the children with T.K. for a few minutes while

6

she went into the store. T.K. did not know Mother was going to shoplift. T.K. stated she was arrested for residential burglary in February 2012. She was not asked and she did not state whether that matter was resolved.

DCFS's counsel and the children's counsel argued the evidence demonstrated the juvenile court should order monitored visitation for Mother, and not unmonitored. Mother's counsel argued the court should grant Mother two hours of unmonitored contact with the children per visit, even if the unmonitored contact were only to take place at the caretakers' residence. Mother's counsel represented that Mother did not contest the criminal charge arising from the shoplifting incident, the criminal case was resolved, and Mother was performing her community service.

After considering the evidence, the juvenile court sustained the amended allegation under section 300, subdivision (b), "as reflected in the mediation agreement" (and quoted above). The court declared the children dependents of the court and ordered them removed from Mother's custody. The children remained placed in the home of Mr. and Mrs. F. with no objection by any party. The court ordered reunification services for Mother and granted her monitored visitation. The court transferred the matter to San Bernardino County.

## DISCUSSION

### Jurisdictional Finding

Mother contends there is insufficient evidence supporting jurisdiction under section 300, subdivision (b), based on the amended allegation in the petition regarding the shoplifting incident.

#### Waiver

DCFS argues Mother waived her challenge to the jurisdictional finding because she informed the juvenile court that she was submitting on the amended allegation set forth in the mediated agreement, and that she was not contesting jurisdiction. We disagree with DCFS's argument.

"An admission that the allegations of a section 300 petition are true, as well as a plea of no contest to a section 300 petition, bars the parent from bringing an appeal to

7

challenge the sufficiency of the evidence supporting the jurisdictional allegations. [Citations.] However, when a parent submits the jurisdictional issue to be determined by the juvenile court solely on the basis of the social worker's report, the parent does not waive his or her right to challenge the sufficiency of the evidence to support the court's jurisdictional finding. [Citation.] Such a submission requires the court to weigh evidence, make evidentiary findings and apply relevant law before making its jurisdictional finding." (*In re N.M.* (2011) 197 Cal.App.4th 159, 167.)

Here, the matter proceeded to adjudication because it did not settle at the mediation. Mother's counsel and the children's counsel did not sign the mediation agreement. The juvenile court did not advise Mother of her "right to a hearing by the court on the issues raised by the petition," her "right to assert any privilege against self-incrimination," her "right to confront and to cross-examine all witnesses called to testify," and her "right to use the process of the court to compel attendance of witnesses." (Cal. Rules of Court, rule 5.682(b).) If a parent "wishes to admit the allegations, the court must first find and state on the record that it is satisfied that the parent . . . understands the nature of the allegations and the direct consequences of the admission, and understands and waives the rights" quoted above. (Cal. Rules of Court, rule 5.682(c).) The juvenile court did not so inquire and Mother did not waive her rights. She did not sign a *Waiver of Rights—Juvenile Dependency* (form JV-190). (See Cal. Rules of Court, rule 5.682(e).) In adjudicating the matter, the juvenile court stated: "The court h[a]s read and considered the evidence. The court finds, by a preponderance of the evidence, that the petition as amended -- as reflected in the mediation agreement and amended in the court file is true, count (b)(1)."

Mother did not waive her right to challenge the sufficiency of the evidence supporting the jurisdictional finding. She submitted on the amended allegation set forth in the mediation agreement, and the juvenile court made the jurisdictional finding based on its consideration of the evidence. Mother did not waive her rights and admit the allegation within the meaning of California Rules of Court, rule 5.682.

8

**Sufficiency of the Evidence**

Jurisdiction under section 300, subdivision (b), is appropriate where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." (§ 300, subd. (b).) In deciding whether there is a substantial risk of serious physical harm, within the meaning of section 300, subdivision (b), courts evaluate the risk that is present at the time of the jurisdictional hearing. "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.)

In reviewing Mother's challenge to the jurisdictional findings, we apply the substantial evidence test. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574.) "'The term "substantial evidence" means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value. [Citation.]' [Citation.] 'In making this determination, all conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.] In dependency proceedings, a trial court's determination will not be disturbed unless it exceeds the bounds of reason. [Citation.]' [Citation.]" (*Id*. at pp. 574-575.)

As set forth above, the juvenile court sustained the following allegation: "On 7/26/2012 the children J[.] and C[.]'s mother, [M.B.], placed the children in a detrimental and endangering situation by shoplifting while the children were in her care. Such detrimental and endangering situation established for the children by the children's mother places the children at risk of harm."

Substantial evidence supports the jurisdictional finding under section 300, subdivision (b). Mother went into Target to steal merchandise after learning about a scheme to take merchandise off a clearance rack and return it for store credit. She became nervous about her plan and decided to leave the store with five shirts she had not paid for instead. She was apprehended and detained.

Mother did not leave her three-year-old and 22-month-old children at home with a caretaker. She brought them to the store and left them outside in the car with her girlfriend while she went inside to commit the crime. Mother did not understand how she had placed her children at substantial risk of serious physical harm. In leaving the store with the stolen merchandise and attempting to get away, Mother was involving her children in a dangerous situation. Store security personnel followed her and law enforcement was called to the scene. Had Mother made it to the car where her children waited, it takes no stretch of the imagination to see how her children could have suffered serious physical harm as store security personnel or officers gave chase and tried to apprehend her.

Mother argues that this incident of petty theft was "an isolated event" and there is insufficient evidence the children were at substantial risk of serious physical harm at the time of the jurisdiction hearing. Based on substantial evidence in the record, we conclude the jurisdictional finding was proper. Mother demonstrated a lack of insight regarding the danger that her criminal conduct posed to the children. In an interview summarized in the jurisdiction/disposition report, Mother acknowledged that shoplifting was "wrong," but stated she "didn't think anything would happen and didn't see how much this would affect the children." Mother had shown the juvenile court a pattern of engaging in poor judgment that placed her children at risk of harm. DCFS and the juvenile court were previously involved with this family from August 2009 to August 2011 after Mother was arrested for child endangerment for leaving then eight-month-old J.B. outside unattended for at least 30 minutes. Less than a year later after those dependency proceedings concluded, Mother engaged in this criminal conduct while her children were waiting outside the store for her. As discussed above, "evidence of past conduct may be probative of current conditions." (*In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 824.) In this case, we believe it is.

**Dispositional Order**

Mother contends the juvenile court's dispositional order removing the children from her custody and granting her only monitored visitation is not supported by substantial evidence.

"After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing. [Citation.] At the dispositional hearing, the court must decide where the child will live while under the court's supervision. [Citation.]

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances. [Citation.]

"Before the court issues a removal order, it must find the child's welfare requires removal because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child. [Citations.] There must be clear and convincing evidence that removal is the only way to protect the child. [Citation.]

"Whether the conditions in the home present a risk of harm to the child is a factual issue. Again, we apply the substantial evidence test. [Citation.]" (*In re N.M.*, *supra*, 197 Cal.App.4th at pp. 169-170.)

In prior dependency proceedings, the juvenile court assumed jurisdiction over J.B. when he was eight months old after Mother was arrested for child endangerment for leaving J.B. outside unattended for at least 30 minutes. During the pendency of those proceedings, the court and DCFS learned that Mother was then in a relationship which involved incidents of domestic violence. Mother received services to address issues that came to light during those prior dependency proceedings. As set forth above, at the disposition hearing, the juvenile court may consider not only the parent's present circumstances but also past conduct. (*In re N.M.*, *supra*, 197 Cal.App.4th at p. 170.)

11

As discussed above, about a year after juvenile court jurisdiction in the prior case ended, Mother was arrested for shoplifting while her three-year-old and 22-month-old children were waiting outside the store with T.K.  The children could not leave the store with T.K., but were transported to and held at the police station, because T.K. also was arrested for driving a car that had been reported stolen.

The juvenile court determined that removal was the only way to protect the children because Mother had engaged in a pattern of conduct which placed the children at risk of harm.  Substantial evidence supports the removal order.  The same evidence supports the court's order granting Mother only monitored visitation with the children.  The court did not err in deciding that Mother needed to work on case issues before unmonitored contact with the children could begin.

## DISPOSITION

The September 24, 2012 adjudication/disposition order is affirmed.

NOT TO BE PUBLISHED.

                                                                  CHANEY, J.

We concur:


        MALLANO, P. J.



        ROTHSCHILD, J.


12